José Rodríguez Pérez, Plaintiff and Appellant-Appellee, *v.* Municipality of San Juan, etc., Defendant and Appellee-Appellant.

No. 7394.   Argued February 25, 1938.—Decided April 8, 1938.

*A. Ortiz Toro* for appellant-appellee.   *J. Valldejuli Rodríguez* for appellee-appellant.

Mr. Justice Travieso delivered the opinion of the court.

This is an action of revendication instituted by José Rodríguez Pérez against the Government of the Capital of Puerto Rico. The litigants, with the approval of the lower court, made a stipulation concerning many of the facts alleged in the complaint and controverted in the answer. The following facts may therefore be taken as alleged and admitted.

The plaintiff is and since June 5, 1919, has been the owner of an urban piece of property situated in the northern section of the Ward of Santurce in the Municipality of San Juan. It is made up of a frame house, zinc-roofed, fronting Ponce de León Avenue and standing upon a lot which measures 26 yd. on the southern side, 34 yd. on the north and 32 yd. and 1 ft. on each of the eastern and western sides. It is bounded on the north by a lot owned by José Rodríguez Pérez, on the south by Ponce de León Avenue, on which it faces; on the east by a lot owned by Ignacio Colón; and on the west by Simón Bolívar Street. Said property is recorded in the name of the plaintiff in the corresponding registry of property.

On February 27, 1923, the defendant occupied, for public use, part of the aforementioned property, to the extent and within the boundaries hereinafter recited, and since that time has remained in possession thereof without just title and with knowledge that it belongs to the plaintiff. The parcel in question has an area of 91.37 square meters and is bounded on the north by the principal property; on the south by Ponce de León Avenue; on the east by a lot belonging to Ignacio Colón; and on the west by Simón Bolívar Street.

As to the value of the strip of land unlawfully detained, which the plaintiff fixes at $4,068.50, and as to the damages caused by the detention, which the plaintiff estimates at $49,502.18, the parties were unable to reach any agreement and therefore those are really the questions of fact as to which there exists a difference of opinion between the litigants.

With regard to the second of the two causes of action set out in the complaint, the defendant admits that the plaintiff is the owner of a strip of land occupied by the defendant for public use, which has an area of 76.18 square meters bounded on the north by Bernardo Fernández, on the south by Ponce de León Avenue, on the west by Simón Bolívar Street and on the east by the lot of which it forms a part, already described as belonging to the plaintiff. The stipulation limits the issues of fact to the question of whether the defendant occupied said parcel about fourteen years ago so as to make it form a part of Simón Bolívar Street, as the plaintiff alleges, or whether on the contrary, this strip has been dedicated to the public use for more than thirty years; and to the question of whether the detained parcel is worth $3,227.20 or $475.08, which are the amounts that the plaintiff and the defendant respectively allege as such value. There remained an issue as to whether or not there was bad faith in the occupation and as to the amount of the damages, if any, caused thereby.

After the case was heard the lower court sustained the complaint and adjudged the defendant to pay to the plaintiff the sum of $8,356.98 on account of the charges which will be hereinafter stated, each party to pay its own costs. Feeling aggrieved by that judgment both parties appealed to this court. The defendant has assigned in his brief two errors; the plaintiff has assigned ten, as follows:

"1. In failing to decide that the lack of just title is evidence *per se* of the bad faith of the defendant.

"2. In deciding that the theory that a lack of title implies a lack of good faith, if it is in fact a theory applicable to a public corporation and to the defendant municipality as such, 'it is about time that it should be changed.'

"3. In deciding that the fact that the municipality occupied a strip of land for a street, when by the type of the building no damage was caused to the property, such occupation is not evidence *per se* of bad faith.

"4. In deciding that the occupation of a parcel belonging to the plaintiff and appellant-appellee even without just title does not amount to bad faith in said possession nor is equivalent to the occupation or deprivation of the property without due process of law.

"5. In holding that the defendant municipality has, in certain cases, the right to occupy strips or portions of land, because since it is a perpetual entity the person injured has always the power or opportunity to be indemnified for any damages he may suffer.

"6. In not decreeing that the municipality should compensate the plaintiff in the sum of $25,000 because he was unable to construct a building which he had planned, as well as because he was unable to develop and extend his business.

"7. In not adjudging the defendant to pay to the plaintiff-appellant the sum of $16,867, representing the cost of adjusting the construction or reconstruction of the building on the lot which is described in the complaint as a result of the change in the level of the street effected by the defendant on the strip of land which faces Ponce de León Avenue.

"8. In not adjudging the defendant municipality to pay the plaintiff for the use and enjoyment of the strip which faces Simón Bolívar Avenue and for the rents and profits which the plaintiff failed to receive by reason of the withholding of that strip, estimated in the sum of $5,000.00.

"9. In not adjudging the defendant municipality to pay the costs, expenses, and attorney's fees.

"10. In the weighing of the evidence and the application of the law when it failed to appraise the strips of land on Ponce de León and Simón Bolívar Avenues in the sums of $4,068.50 and $3,227.20, respectively, making a total of $7,295.70."

█ We believe that a detailed discussion of the first five assignments is unnecessary. When a judgment is correct and the reasons or grounds supporting it are erroneous, no prejudice or harm is caused to the appellant which he can invoke as the basis for an appeal. The latter is taken from the judgment, in order to correct any errors contained therein, and not from the opinion on which it is based, even though the opinion may be erroneous.

"The third assignment relates to one of the grounds on which the lower court based its judgment. But if the decision is correct, the fact that its reasoning is erroneous is not sufficient ground for reversal." *Ryan* v. *Heirs of Ryan*, 51 P.R.R. 42, 51, and cases cited therein.

█ Although the questions raised by the appellant in his first four assignments of error with regard to the good or bad faith with which the defendant is retaining the parcels of land the object of this litigation may be important in connection with an adjudication of the profits *(frutos),* nevertheless they serve no practical purpose in this appeal, because in the judgment, in spite of the statements of the trial judge in his opinion, the appellant has obtained everything which he would have been entitled to receive from a possessor in bad faith, as it will be shown. If that is the purpose which the appellant seeks, what difference does it make that the lower court in its opinion should have said what the appellant states in his first four assignments?

It is true that from the opinion delivered in this case, and especially from those statements therein which the appellant considers as erroneous, it does not appear that the court *a quo* considered the defendant municipality as a possessor

in bad faith, but since in spite of this the profits were awarded in accordance with section 384 of the Civil Code, it is unnecessary to decide whether or not the first four errors assigned by the appellant in his brief were committed, for even if we should accept that the trial judge did commit them, the appellant would not thereby acquire any greater rights than those which were accorded to him. Whether or not the appellant was compensated for all those damages which are compensable under section 384, *supra*, will be decided by us when we take up the other errors assigned.

That section, literally transcribed, reads as follows:

"Section 384.—A possessor in bad faith shall pay for the fruits collected and for those which the lawful possessor might have collected, and shall only have the right to be reimbursed for the necessary expenses incurred in the preservation of the thing. Expenses incurred in improvements for luxury and pleasure shall not be refunded to the possessor in bad faith; but he may remove the objects for which such expenses have been incurred, provided the thing suffers no injury thereby, and the lawful possessor does not prefer to retain them and pay the value they may have at the time he enters into possession."

In the judgment appealed from the defendant is ordered to pay to the plaintiff the sum of $8,356.98 which is made up of the following items:

"2,741.10 for the parcel or strip of land pertaining to Ponce de León Avenue.

"$1,904.50 for the parcel or strip of land pertaining to Simón Bolívar Street.

"$3,345.00 as compensation for the profits or rents which those parcels of land would have produced to the plaintiff during the time they were in the possession of the defendant.

"$366.38 for taxes paid to the Insular Treasury on the two parcels of land involved in this suit."

The item of $3,345 as indemnity to the plaintiff for the profits which the parcels of land would have produced, and to which the plaintiff would not have been entitled had the court considered the defendant a possessor in good faith,

clearly shows that the court took section 484 of the Civil Code into account when it rendered the judgment appealed from.

Like the first four assignments of error, the fifth assignment refers to alleged errors in the opinion which if actually committed would not alter the judgment, and therefore we shall give it no further consideration.

■ We shall now determine whether the lower court granted the plaintiff all the compensation to which he was entitled according to section 384 of the Civil Code.

The plaintiff claims in the complaint the sum of $25,000 "inasmuch as it became impossible for him . . . to construct a building which he had planned and was in a condition to construct on and before the date of the detention, and likewise because he was unable to develop and enlarge his business"; $16,867 for "the necessary readjustment of the building standing on the lot . . . as a result of the change in the grade of the street," and $5,000 for "benefits, rents, earnings and interest upon" the strip of land adjoining Simón Bolívar Street. The court found that these items were too remote, speculative, illogical, and unreasonable and refused to grant them. The appellant attacks this holding in the sixth, seventh, and eighth assignments which we shall examine separately.

We concur in the views of the lower court with regard to the $25,000. To concede that the plaintiff is entitled to damages for the reason that it became impossible for him to construct a building which he had planned, would be to invade the field of speculation. There are certain future events which can not be definitely fixed beforehand such as the amount of the rental, which fluctuates in accordance with supply and demand and the ability to pay it; the number of vacancies and the length of time which the premises remain vacant; rentals which for some reason or other it has been impossible to collect, and many other factors which it is unnecessary for us to enumerate.

"Another error made by the master, and by the court, is, as to the extent to which the rule is to be carried, that a possessor in bad faith is bound to respond for all that the property possessed can be made to produce. We do not understand that this rule requires a possessor to change the state of the property. Suppose, for example, a large tract of land is wild, mostly forest, and might be made to produce immense yields of grain and produce if it were cleared of timber and broken up and cultivated. Is the possessor in bad faith —only technically such perhaps—bound to respond to the true owner, on recovery, for the thousands of bushels of wheat and corn and other produce that might have been raised on the land? It is the duty of a possessor, even a possessor in bad faith, to change the state of the land from wild land to cultivated, farming land, for example, or to open and work mines of iron or copper or gold, so as to make as much out of the land as can be made out of it, and hand it over to the true owner? Does any such principle as this prevail in the law? We think not. The estimation of such undeveloped revenues is altogether too speculative a matter." *New Orleans* v. *Gaines,* 131 U. S. 191, 217.

Nothing can serve better to show the degree to which speculation may be carried in these cases than the calculations made by the plaintiff himself. He testified at the trial that he was planning the construction of a building at a cost of $45,000 which he expected would produce "a little over $800" *net, per month,* that is, $9,600 a year. This net rental represents a little over 21 per cent net interest on the capital investment, an amount which would undoubtedly be an exaggerated income and perhaps without precedent.

". . . The balance of the sum of $768.77 sued for, or $549.12, is, to quote the very words of the complaint, 'the amount of 25 per cent on $219.65 which the plaintiff has lost on account of not having gained it monthly as net profits on the said money employed in his business house from October 24, 1911, to date, or eighteen months.'

"We will refrain from considering and deciding whether or not there is a cause of action as to the items of $131.55 and $88.10 and consider only the item of $549.12 which' is claimed as unrealized profits.

"We summarized substantially the facts alleged in the complaint and in referring later to the item of $549.12 we literally transcribed

the allegation of the plaintiff. As may be seen from all the foregoing, no extraordinary circumstance is pleaded but simply a claim is up for 25 per cent monthly, or 300 per cent annually, as net profits on the amount which the plaintiff failed to receive and on the amount which, as he alleges, he expended by reason of the acts of the defendant, provided the said amounts had been employed in the commercial establishment of the plaintiff. The plaintiff's pretension is so extraordinary; his claim of 25 per cent monthly is so devoid of foundation that it must be concluded that he has no cause of action as to the item of $549.12.'' *González* v. *Rosado,* 23 P.R.R. 1, 4.

In *Palou y Sobrino* v. *Dueño et al.,* 15 P.R.R. 556, this court, in passing upon a claim for damages which was similar to that presented in this case, said:

''. . . The fourth clause of the complaint sets out the damages as follows:

'' ''*      *      *      *      *      *      *

''Product of 25 *cuerdas* of tobacco which it was thought to sow in these lands according to the custom of the lessees . . . 500.

''The second item, namely, for profits on tobacco that appellants might have made is manifestly too remote.''

We agree with the lower court that the damages claimed on the basis stated are too remote, speculative, and unreasonable. There is no legal principle to justify the award of such damages.

■■ The seventh error requires careful analysis. When the trial judge considered the item of $16,867 claimed by the plaintiff as representing the cost of readjusting the building to the new grade of Ponce de León Avenue, he was of the opinion that these damages were remote, speculative, illogical, and unreasonable, and denied them. Perhaps it would be convenient to state definitely before proceeding, that the examination which we have made of the evidence has led us to the conclusion that the difference between the old and new grade of Ponce de León Avenue at the place where the plaintiff's lot is located, is 1.35 meters.

Section 2 of the Organic Act of Puerto Rico provides that: "Private property shall not be taken or damaged for public use except upon payment of just compensation ascertained in the manner provided by law."

In the absence of a constitutional provision like the one cited or like those of similar statutes, neither the Supreme Court of the United States nor any state supreme court has considered a municipal corporation as liable for consequential damages caused to an adjacent owner as a result of the change in the grade of a street, unless negligence should exist or the municipality should occupy land belonging to said adjacent owner. *Darman* v. *City of Jacksonville*, 13 Fla. 538; *Simmons* v. *City of Camden*, 26 Ark. 276; *Fuller* v. *Atlanta*, 66 Ga. 80; *Wright* v. *City of Wilmington*, 92 N. C. 156; *Reynolds* v. *Mayor, etc., of Shreveport*, 13 La. Ann. 426–428; 5 McQuillin, Municipal Corporations, sec. 2114, page 460. The same doctrine prevailed and still exists in those states wherein no cause of action has been granted to the person damaged under those circumstances, and the constitutions of which only guarantee that private property shall not be "taken" for public use without due compensation. *Northern Transp. Co.* v. *Chicago*, 99 U. S. 635; *City of Kokomo* v. *Mahan*, 100 Ind. 242; *Smith* v. *City of Eau Claire*, 78 Wis. 457. In the last-cited case the court said:

"Perhaps no rule of law is more completely settled than is the rule that if consequential damages result to property owners from raising or lowering the grade of a street by a municipality, it is not a taking of private property for public use within the meaning of the constitution; and that if the municipality act under autority of law in making the change of grade and with due care, it is not liable for such damages, unless made so by some statute or constitutional provision."

In 1870 the State of Illinois amended its constitution so as to guarantee not only that private property should not be "taken" for public use without just compensation but also

that it should not be "damaged." Its example was followed by many other states and by the Federal Congress when it drafted and subsequently passed our Organic Act. The amendment brought with it a radical change in the decisions regarding the liability of municipal corporations for their action in grading or changing the grade or level of its streets and avenues. In 30 Am. St. Rep. 837 this new situation is summed up as follows:

". . . In the states where this special constitutional provision exists, the courts have been unanimous in holding that although prior to its enactment a municipal corporation was under no liability to an adjoining land-owner for any damages sustained by him from the action of the city in grading or changing the grade of its streets unless his property was actually invaded, yet under such constitutional provision a city is liable to him *for all direct and consequential damage* arising from its action in grading or changing the grade of its streets, unless he is compensated under the power of eminent domain before the work is done, or unless the injury sustained by him is shared by the public in general. (Citations) This rule has been sustained by the supreme court of the United States in the case of *Chicago* v. *Taylor*, 125 U. S. 161, where the court reached the conclusion that under a constitutional provision that private property shall not be taken or damaged for public use without just compensation, a recovery may be had in all cases where private property has sustained a substantial injury from grading or changing the grade of a street by a city, *whether such damages are direct or consequential in their nature;* and when property is damaged by establishing the grade of a street, or by lowering or raising the grade of a street previously established, it is damaged for the public use within the meaning of such a constitutional provision: *Werth* v. *City of Springfield*, 78 Mo. 107; *McElroy* v. *Kansas City*, 21 Fed. Rep. 257." (Italics ours.)

In *Reardon* v. *San Francisco*, 66 Cal. 492, 505, the Supreme Court of that state said:

". . . The provision includes damage to private property, including land, and whatever is attached to it. If land and buildings on it, or either, are damaged, this provision requires it to be compensated. And if compensation has not been had in condemning the land for

the street under the statute for such condemnation, (see secs. 237, 1263, Code Civil Proc., pt. 3, title 8) it can be recovered in an action.''

In the case of *City of Atlanta* v. *Green*, 67 Ga. 386, it was said:

''. . . In previous constitutions, the words varied from the present. 'Private property shall not be taken for public use without just compensation,' were the words ordinarily used. But, under the constitution of 1877, further protection is sought to be given to the property of the citizen; and now 'it shall not be taken or damaged' for public use without just compensation. *The article does not define whether the damage shall be immediate and direct, or consequential. Any damage to property for public use must receive its compensation.*'' (Italics ours.)

In 4 McQuillin, Municipal Corporations, page 384, section 1599, that author, in a footnote expresses himself as follows:

''. . . Where this special constitutional provision exists, the rule of municipal liability has been changed and greatly enlarged. The courts have, without a single exception, held that although prior to these provisions a municipal corporation was under no liability to an adjoining abutting landowner for any damages sustained from the action of the city in grading or changing the grade of its streets, unless his property was actually invaded, under such provisions a city is liable to him for all direct and consequential damages resulting from changing the grade of the street, where the damage thus inflicted exceeded the benefit derived from the grading. Of course, the same rule applies to all improvements of a public character.''

The district court erred, therefore, in deciding as a matter of law that because the item of $16,867 consisted of remote, speculative, illogical, and unreasonable damages, the plaintiff had no right to recover them. Let us now see whether the plaintiff suffered any damage as a result of the widening of the street.

■■ The measure of damages in these cases is the difference in the value of the property before and after the improvement.

"MEASURE OF DAMAGES.—Damages are usually measured by the lessening of the fair market value of the property affected directly due to the work of the improvement, to be ascertained from the nature of the improvement and the circumstances of each case in view of the local law applicable. This is to say that the measure of damages resulting to property from a change of grade of the street or other public improvement is the difference between the fair market value of the property just before the work was done and such value thereafter, less any special benefit and advantage thereto resulting from the improvement." McQuillin, Municipal Corporation, vol. 5, p. 506, sec. 2139.

In 30 Am. St. Rep. 845, it is said:

". . . The rule is stated in *Parker* v. *Atchison,* 46 Kan. 14, to be, that where a city changes the grade of one of its streets, an abutting lot-owner will be entitled to any special damage he may suffer thereby; and in a suit to recover, the jury may take into consideration the condition of the property, the street, and the grade, and also the market value of the property immediately before and after the grading; and when the property is injured in value, the measure of damage will be the difference in the market value brought about by reason of the change of the grade; and when the property is not injured in value by reason of such change, no damages can be recovered. The damage must be measured by the pecuniary loss; and if the property is benefited as much as damaged by the change of trade in the abutting street, there can be no recovery. (Citations) . . . Any general benefit common to all other property should not be considered in determining whether the property is benefited as much as injured or not. While the measure of damages is the difference in the market value of the abutting property before and after the grading is done, yet neither the falling of a brick wall nor the apprehended undermining of a dwelling-house situated thereon can be considered in estimating the damages."

In the case of *Moore* v. *City of Atlanta,* 70 Ga. 611, the court held:

". . . if any owner of property be damaged by the grading of a street, so as to lessen the pecuniary value of his property, he may recover damages for such injury to his freehold. That damage will be measured by the decrease in the actual value of his property. If

the value pecuniarily be not decreased, he can recover nothing. If it would have been decreased in value as a mere residence, without regard to the improvement of access made by the grade of the street, and yet this improvement and the increased value thereby produced equaled the inconvenience or discomfort of the house as a mere residence, then the one could be set off against the other, and no recovery could be had. In other words, the right of recovery would turn in each case on the diminution in the pecuniary or market value of the property caused by the grade.''

See also *City of Chawneetown* v. *Mason,* 82 Ill. 337; *Lehigh Valley Coal Co.* v. *Chicago,* 26 Fed. 415; and *Springer* v. *City of Chicago,* 135 Ill. 553.

Applying to the case at bar the rule established by the authorities which we have just cited, we find that there is not a sufficient basis in the evidence upon which to fix the compensation to which the plaintiff would be entitled. The plaintiff had ample opportunity during the trial to prove, in accordance with the rule cited, the decrease in value suffered by his building and lot as a direct result of the widening and change in the grade of Ponce de León Avenue. We have carefully read the testimony of plaintiff's expert witness, Etienne Totti, who testified that he was acquainted with the house and lot belonging to the plaintiff ever since the year 1913; that the building might have been built anywhere from twenty to twenty-five years ago and that it is made of ordinary wood *(pichipén)* without any native wood; that he believes that in the year 1923 said house was worth about $4,000; that the annual depreciation in frame houses is about 4 per cent; and that the plaintiff's house as it stands today might be worth $2,500. The witness said nothing with regard to the diminution in the value of the lot as a result of the works carried out by the municipality in the year 1923.

Giving the testimony of the expert Totti the full credit to which it is entitled, the only matter proven by it is that the house in question was worth about $4,000 in 1923 and that twelve years later, or in 1935 when the witness testified,

the value of the property had been reduced to $2,500. Was this difference of $1,500 in the value of the house due to the public works mentioned or was it due to the annual 4 per cent depreciation normally suffered by wooden structures? In the absence of evidence to the contrary as to the first point we must conclude in accordance with the testimony of the expert, that the diminution in the value of the house was the natural consequence of the annual depreciation of 4 per cent which is normally suffered by this type of building.

The evidence introduced by the plaintiff would not justify a modification of the judgment appealed from.

█ We now proceed to consider the eighth assignment, in which the plaintiff complains of the fact that the lower court did not grant him all the rents and earnings which the parcel abbutting on Simón Bolívar Street might have produced him. The lower court appraised the parcel in the amount of $1,904.50, and granted the plaintiff 6 per cent interest on this sum during the twelve years that the Government of the Capital held it. The plaintiff insists that had he been able to put up the building which he had planned the rents therefrom would have amounted to $5,000. For the reasons stated in the discussion of the sixth assignment of error, we are of the opinion that the lower court granted the plaintiff all that he was entitled to receive.

█ The lower court was not mistaken, as the plaintiff maintains, in not taxing costs, expenses and attorney's fees against the defendant. The claim of the plaintiff was so exaggerated and disproportionate that the defendant was not guilty of rashness in defending itself. In the complaint he prayed for $63,797.88; the court granted him $8,357.28. The case of *García* v. *Fernández*, 52 P.R.R. 176, is fully applicable to this case and for the reasons and citations therein stated this assignment should be overruled.

Regarding the tenth and last assignment, we will only say that from the stenographic transcript of the record it does not appear that the trial court committed manifest error

in the weighing of the evidence when it appraised the two strips of land involved in this case strictly in accordance with the proof.

▪ Let us now examine the appeal taken by the defendant. In its brief two errors are assigned. The first reads as follows:

"In holding that the Government of the Capital is bound to compensate the plaintiff for the detention of the two strips of land indicated, in the amount of $3,345 as accrued legal interest."

The defendant bases this contention on the proposition that neither in the statutes creating the old Municipality of San Juan nor in Act No. 99 of May 15, 1931, establishing a special government for the Capital of Puerto Rico, is there "any provision by the sovereign declaring that its creature, the extinct Municipality of San Juan or the present Government of the Capital, is bound to pay any compensation for the possession of property dedicated to the public use by way of interest on the value of said property." Section 2 of our Organic Act prohibits, as we have seen, the *taking* or *damaging* of private property for public use without the payment of just compensation fixed in the manner provided by law. The Civil Code has the same or a similar pronouncement. Section 282, (1930 ed.) reads:

"No person shall be deprived of his ownership, except it be by a competent authority and for a justified purpose of public utility, and after having been properly indemnified."

In the third paragraph of that same section the following may be found:

"The indemnification shall comprise, not only the value of the thing whereof the owner is deprived, but also a compensation for any damages and injuries which may be caused him by the deprivation of the property."

The fact that the trial judge should have fixed the amount of the compensation to which the plaintiff is entitled at 6 per cent of the value of the detained parcels is of no impor-

tance whatsoever. The right of the plaintiff to "a compensation for the damages caused to him by depriving him of his property" having been established, it is of little or no importance, in our opinion, that the lower court should have adopted as a measure of the compensation to be allowed interest at the legal rate on the value of the land.

■ The second assignment of error reads thus:

"In holding that the Government of the Capital was bound to pay to the plaintiff $368.68 for taxes which he alleges were paid by him."

The judgment of the lower court acknowledged the plaintiff's alleged title to the two parcels of land occupied by the municipality for public use. The trial court moreover granted the plaintiff compensation for what he failed to receive as rents or benefits during the period of the detention of the realty by the municipality. In other words, the judgment appealed from placed the plaintiff in the same legal position that he would have been on the date of the judgment had the illegal detention of his possession never taken place. We see no legal reason to justify the imposition upon the defendant of the obligation to reimburse the plaintiff for the amount of the taxes paid by the latter. The plaintiff paid these taxes as owner of the property, which ownership he still retains and will retain until the value fixed by the court is paid to him. The lower court erred in ordering the reimbursement of the taxes by the defendant.

For the reasons stated the judgment appealed from is modified by eliminating therefrom the pronouncement whereby the municipality was ordered to reimburse the amount of $368.68 for taxes, and, as so modified, the judgment is affirmed.